**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Bose, | No. CV 09-02257-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael J. Astrue, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Steven Bose ("Plaintiff") seeks judicial review and reversal of the final decision of the Commissioner of Social Security to deny Plaintiff's claim for Social Security benefits pursuant to 42 U.S.C. § 405(g). After consideration of the arguments set forth in the parties' briefs, the record in the case, and the applicable law, the Court issues the following order.

**I.    BACKGROUND**

  **A.    MEDICAL AND PROCEDURAL HISTORY**

    **1.    MEDICAL HISTORY BEFORE AUGUST 23, 2006**

Plaintiff asserts that as of October 2002, he has been suffering from a series of medical conditions that cause him severe back and neck pain. (Doc. 19-4 at 5). In November of 2002, a magnetic resonance imaging ("MRI") scan of Plaintiff's spine

1  "revealed mild diffuse degenerative changes." Id. The scan also showed "mild broad-based
2  bulging of the C5-6 and C6-7 disks." Id. On June 27, 2003, Plaintiff underwent a
3  neurological evaluation conducted by Dr. John H. Schneider, a board certified neurological
4  surgeon. Id. Although the evaluation revealed that Plaintiff "had no weakness in his upper
5  or lower extremities," it also showed that Plaintiff suffered from "headaches, neck pain, and
6  cervical spondyolosis." Id. Dr. Schneider concluded, however, that there was "no structural
7  abnormality that would prevent the claimant from working, at least in a modified capacity."
8  Id.

9        In February of 2005, Plaintiff began treatment at the Kingman Regional Medical
10 Center ("KRMC"). (Doc. 19-9 at 28). At the initial visit, on February 3, 2005, Plaintiff
11 presented with back and hip pain with onset allegedly occurring three years prior to the visit.
12 Id. An MRI performed the next day revealed that Plaintiff had "minimal degenerative
13 changes of the right hip." Id. at 27. Plaintiff returned to KRMC on March 3, when a
14 physician determined that Plaintiff was suffering from "cervical spondylosis" and "mild
15 diffuse degenerative changes." Id. at 26. On March 31, 2005, another MRI scan of
16 Plaintiff's lower back "revealed mild disc desiccation at the L2-3 and L3-4 and degenerative
17 facet disease from L3-4 and L5-S1." Id. There was, however, "no evidence of spinal
18 stenosis or significant findings on MRI scan of the thoracic spine." Id. One month later,
19 Plaintiff began seeing Dr. Attiya Salim for pain management. (Doc. 19-8 at 6–12). Between
20 April 26 and May 24, 2005, Dr. Salim administered three lumbar epidural nerve blocks to
21 help control Plaintiff's lower back pain. Id.

22       On June 8, 2005, Plaintiff returned to KRMC and was examined by Larry Drumm,
23 D.O., a family practice resident. (Doc. 19-9 at 17). During that exam, Plaintiff indicated that
24 the injections he received from Dr. Salim relieved his pain for only a few days. Id.
25 Following the exam, Dr. Drumm concluded that Plaintiff suffered from: "(1) degenerative
26 joint disease-lumbar spine; (2) scoliosis-lumbar and thoracic spine–both verified with
27 radiographic studies; (3) hypertension, controlled without medication; [and] (4) arthritis."
28 Id. Dr. Donald Morgan, D.O., reviewed Dr. Drumm's findings and agreed with them. Id.

- 2 -

1  On October 10, 2005, Plaintiff returned to the KRMC Family Practice Clinic for additional
2  treatment. Id. at 15. Plaintiff was seen on this occasion by clinic resident Dr. Saleem
3  Akhtar, D.O., F.P.. Id. Dr. Akhtar's findings at this visit were consistent with those of Dr.
4  Drumm at the June visit, reflecting degenerative joint disease, scoliosis, arthritis, and
5  hypertension. Id. Immediately following the exam, Dr. Mohammed Subhan reviewed Dr.
6  Akhtar's findings and agreed with them. Id.

7  In January of 2006, Plaintiff began seeing Dr. Benjamin Venger. (Doc. 19-8 at 31).
8  Dr. Venger evaluated Plaintiff and concluded that he suffered from chronic neck and back
9  pain. Id. On February 21, another MRI of Plaintiff's cervical spine was performed,
10 revealing "only very mild spinal stenosis at C5-6 and C6-7 with no significant compression
11 of the spinal cord." (Doc. 19-4 at 8). The scan also showed that there was "no impingement
12 upon the existing cervical nerve roots." Id. On March 16, however, Dr. Venger concluded
13 that the best course of action was to operate on Plaintiff's neck. (Doc. 19-8 at 29). Two
14 months later, Plaintiff underwent surgery to stabilize his spine at the C5-6 vertebrae. Id. at
15 14. The surgery was performed by Dr. Venger and involved the attachment of a metal plate
16 to Plaintiff's spine. Id. According to the post-surgery report, the operation was successful
17 and was completed without complication. Id. Two months after his surgery, on July 27,
18 Plaintiff indicated that he was experiencing "a little bit of neck pain" but that, overall, he was
19 "happy with his surgery." Id. at 25.

20  **2.  FIRST ALJ DECISION**

21  On January 2, 2004, Plaintiff filed his first Title II application for a period of disability
22 and disability insurance benefits which alleged disability beginning October 3, 2002. (Doc.
23 19-4 at 5). Plaintiff's application was denied initially on June 9, 2004, and upon
24 reconsideration on August 4, 2004. Id. Plaintiff appealed the decision and a hearing was
25 held on June 21, 2006 before Administrative Law Judge ("ALJ") Ronald C. Dickinson. Id.
26 At that hearing, the ALJ heard testimony from the Plaintiff and from Mark J. Kelman, M.A.,
27 C.D.M.S., a vocational expert. Id.

28  After considering "all of the evidence marked as exhibits in [Plaintiff's] file, the

- 3 -

testimony at the hearing, and the arguments presented," the ALJ determined that Plaintiff suffered from the following series of impairments: "degenerative joint disease and degenerative disc disease of the cervical spine, degenerative joint disease of the lumbar spine, chronic lower back pain, neck pain, and right leg pain . . . and headaches." (Doc. 19-4 at 5, 7). The ALJ further determined, however, that Plaintiff's testimony was not "fully credible concerning the severity and extent of his limitations." Id. at 9. In reaching that conclusion, the ALJ reasoned that although Plaintiff suffered from a series of ailments, none was disabling. Id. Instead, it appeared that Plaintiff had been receiving treatment for his conditions and that those treatments were having at least some positive effect. Id. Furthermore, the ALJ observed that Plaintiff was able to perform household activities such as cleaning, doing laundry, and cooking, and that those activities undermined any assertion of disability. Id. Additionally, the ALJ noted that none of Plaintiff's treating physicians "completed a medical source statement on [Plaintiff's] ability to do work-related physical or mental activities." Id. at 10. Finally, the ALJ pointed out that Mr. Kelman, the vocational expert, had determined that, given all of Plaintiff's alleged ailments, he was nonetheless able to "perform the requirements of representative jobs such as production assembler, office helper, and cashier." Id. at 11.

On August 23, 2006, the ALJ rendered his decision and concluded Plaintiff had the "residual functional capacity to perform the exertional requirements of light, unskilled work that allows for a sit/stand position." Id. at 8. The ALJ therefore found that Plaintiff did not meet the requirements for disability under sections 216(i) and 223(d) of the Social Security Act and that he was not entitled to benefits. Id. at 12. Plaintiff did not timely appeal the ALJ's final determination.

In sum, as of August 23, 2006, Plaintiff was suffering from the following conditions, none of which was disabling: degenerative joint disease and degenerative disc disease of the cervical spine, degenerative joint disease of the lumbar spine, chronic lower back pain, neck pain, and right leg pain, and headaches.

**3.    MEDICAL HISTORY AFTER AUGUST 23, 2006**

- 4 -

On January 10, 2007, an MRI of Plaintiff's cervical spine revealed "no disc herniation or nerve root impingement at the C2 or C3 disc space levels." (Doc. 19-8 at 16). The scan also indicated, *inter alia*, that there was "no definite nerve root impingement at the C4-5 or the C6-7 nerve root levels." Id. Plaintiff's pain, however, had apparently persisted, as he began seeing Dr. David Kane, a pain management specialist, on February 23, 2007. Id. at 66. At that visit, Plaintiff filled out a questionnaire and indicated that he was suffering from sharp pains in his lower back and right shoulder. Id. On March 23, Plaintiff returned to Dr. Kane's office and filled out another questionnaire, again indicating that he was suffering from sharp pains in his lower back and right shoulder. Id. at 64. When filling out the questionnaire, Plaintiff was to rate his pain at a number between 0 and 10, 0 being "no pain at all" and 10 being the "worse [sic] pain you can imagine." Id. Plaintiff indicated that his pain level on March 23 was a 7 and his average daily pain was between 8 and 9. Id. at 64. On the same day, Dr. Kane administered the first of a series of injections of pain medication into Plaintiff's back to help alleviate his pain. Id. at 56.

Over the next six months, Plaintiff returned to Dr. Kane on a number of occasions for follow-up visits and additional injections. Id. Dr. Kane administered injections on April 18, June 14, and June 27. Id. at 55, 53, 52. On each day that Plaintiff received an injection, he also filled out a pain questionnaire. Id. at 61–64. On April 18, Plaintiff reported his pain that day as a 5 and his daily average pain as an 8. Id. at 63. At the June 14 visit, Plaintiff rated his pain level at 4 to 5, with a daily average pain level of 7. Id. at 62. On June 27, Plaintiff wrote that his pain was a 4 and his daily average was a 7. Id. at 61. Although it is unclear whether injections continued after June 27, Plaintiff returned to Dr. Kane's office on July 19 and September 11. Id. at 59, 60. On July 19 Plaintiff filled out another questionnaire, indicating that his pain level that day was between 4 and 5, and his daily average pain was between 6 and 7. Id. at 60. Plaintiff filled out a final questionnaire at Dr. Kane's office on September 11, indicating that his pain that day was between 3 and 4, but not indicating a particular average pain level. Id. at 59.

Dr. Kane also examined Plaintiff and prepared pain clinic re-evaluations on April 23,

- 5 -

1  July 19 and September 11, 2007. The April report indicates that while there was tenderness
2  in Plaintiff's back, he experienced "significant relief" following treatment. Id. at 54.
3  Similarly, in the July 19 report, Dr. Kane noted that Plaintiff was "overall doing very well."
4  Id. at 70. In the September report, Dr. Kane indicated that Plaintiff's back was "better," but
5  that his neck and headache pain was increasing. Id. at 51.

6  On November 1, 2007, Plaintiff returned to KRMC for treatment and saw Dr.
7  Mohammed Subhan for a follow-up visit. (Doc. 19-9 at 6). Over the course of the next
8  thirteen months, Plaintiff saw Dr. Subhan on seven separate occasions. At these meetings,
9  Dr. Subhan conducted thorough examinations of Plaintiff and noted his symptoms. At the
10 November, 2007 visit, Dr. Subhan noted that Plaintiff appeared "well developed, well
11 nourished," and "in no acute distress." Id. at 7. At the same visit, Dr. Subhan also reported
12 that Plaintiff's neck exhibited "no decrease in suppleness" and that Plaintiff's back exhibited
13 no symptoms. Id. Nonetheless, Dr. Subhan assessed Plaintiff as having degenerative disc
14 disease and chronic neck and back pain. Id. at 8. On December 4, Plaintiff again saw Dr.
15 Subhan. Id. at 3. Dr. Subhan's report following that visit reflects no substantial change in
16 Plaintiff's condition. Id. Plaintiff subsequently returned to Dr. Subhan on April 8, May 6,
17 and July 1, 2008. Id. at 87–92. With the exception of a finding on May 6 that Plaintiff's
18 back was tender and experienced muscle spasm, the visits on April 8, May 6, and July 1
19 yielded no indication that Plaintiff's condition had changed. Id. Notwithstanding those
20 findings, Dr. Subhan prepared a "Medical Assessment of Ability to do Work Related
21 Activities" on July 8, 2008 indicating severe limitations on Plaintiff's ability to work. Id. at
22 80–82. The assessment included four important conclusions relating to Plaintiff's ability to
23 work: (1) Plaintiff could sit or stand for only fifteen minutes at a time; (2) Plaintiff could sit
24 for only two hours in an eight-hour work day; (3) Plaintiff could only stand for two hours in
25 an eight-hour work day; and (4) Plaintiff's pain severely affected his ability to function. Id.

26 Plaintiff returned to Dr. Subhan for additional follow-up visits on July 31 and
27 December 17, 2008. Id. at 73–79. Once again, Dr. Subhan gave no indication that Plaintiff's
28 condition had changed or that he was exhibiting any new symptoms. Id. Six months later,

in June of 2009, Dr. Subhan prepared a second assessment of Plaintiff's ability to work. Id. at 93–95. Although the report asked for the same information that Dr. Subhan provided on the July, 2008 report, Dr. Subhan's answers differed significantly. This time, Dr. Subhan indicated that Plaintiff could stand for only five minutes at a time, while maintaining the ability to sit for fifteen minutes at a time. Id. Next, Dr. Subhan indicated that Plaintiff could now only stand for a total of one hour during an eight-hour work day. Id. Finally, Dr. Subhan indicated that Plaintiff's pain affected his ability to function in a moderately severe manner. Id.

At the hearing, Plaintiff also submitted a letter written by Dr. Salim discussing Plaintiff's alleged impairments. (Doc. 19-9 at 31). The letter is dated December 20, 2007, and asserts that Plaintiff has been suffering "with Lumbar Disc Disease, Disc Desiccation seen at L2-3 and at L3-4" and "Degenerative Facet Disease that is seen from L3-4 through L5-S1." Id. Dr. Salim also states that she has "tried to relieve [Plaintiff's] pain level . . . with a series of lumbar epidural steroid injections and facet injections." Id. The letter states that these injections were able to control, but not completely eradicate Plaintiff's pain. Id. Finally, Dr. Salim asserts that Plaintiff suffers from pain on a daily basis and that his impairments "limit his ability to sit or stand for any extended period of time." Id. Although there is evidence that Dr. Salim treated Plaintiff in 2005, the letter does not include reference to any medical records that give context to Dr. Salim's assertions.

### 4. SECOND ALJ DECISION

Plaintiff subsequently filed a second Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on October 29, 2007.[1]  (Doc. 19-3 at 15). Although the application alleged disability

---

[1] Ninth Circuit law dictates that, "[i]n order to obtain disability [insurance] benefits, [a claimant] must demonstrate he was disabled prior to his [or her] last insured date." Morgan v. Sullivan, 945 F.2d 1079, 1080 (9th Cir. 1991) (citing 20 C.F.R. § 404.1520). "The burden of proof on this issue is on the claimant." Id. Thus, in order for Plaintiff to be eligible for insurance benefits, he had the burden of proving that he was disabled on or before December 31, 2007, his date last insured.

1  beginning on October 2, 2002, Plaintiff later amended the onset date to August 25, 2006. <u>Id.</u>
2  at 33–34. On February 20, 2008, Plaintiff's claims were initially denied. <u>Id.</u> at 15. The
3  claims were denied again upon reconsideration on May 14, 2008. <u>Id.</u> Plaintiff timely
4  appealed the decision, and a hearing was held before ALJ M. Kathleen Gavin in Bullhead
5  City, Arizona on June 2, 2009. <u>Id.</u>

6        At the hearing, ALJ Gavin heard testimony from the plaintiff and from Dr. George J.
7  Bluth, a vocational expert. <u>Id.</u> at 31–54. Plaintiff testified that he suffered from debilitating
8  neck, back and hip pain, which, in his opinion, precluded him from working. <u>Id.</u> Plaintiff
9  also testified that the pain was so debilitating as to occasionally confine him to his bed. <u>Id.</u>
10 at 43. Nonetheless, Plaintiff conceded that he continued to help his mother perform
11 household tasks, such as peeling potatoes, washing dishes, and shopping for groceries. <u>Id.</u>
12 at 43–44. Following Plaintiff's testimony, the ALJ interviewed Dr. Bluth and discussed
13 Plaintiff's ability to work. <u>Id.</u> at 49–53. Dr. Bluth testified that, in light of Plaintiff's alleged
14 disabilities, "he would be limited to light, unskilled work that offers a sit/stand option, and
15 there are jobs such as cashier or an assembly worker or a quality control inspector that offer
16 that sit/stand option." <u>Id.</u> at 52. After the ALJ read aloud Dr. Subhan's assessment of
17 Plaintiff's ability to work, however, Dr. Bluth, assuming the accuracy of Dr. Subhan's
18 assessment, concluded that there would "not be substantial gainful activity" available to
19 Plaintiff. <u>Id.</u> at 53.

20       On July 20, 2009, the ALJ rendered her decision. Relying on <u>Chavez v. Bowen</u>, 844
21 F.2d 691 (9th Cir. 1988), the ALJ said that ALJ Dickinson's decision had res judicata effect
22 and that under <u>Chavez</u>, "in order to overcome the presumption of continuing nondisability
23 arising from the first administrative law judge's findings of nondisability," a claimant "must
24 prove 'changed circumstances' indicating greater disability." 844 F.2d at 692. Applying
25 <u>Chavez</u>, the ALJ determined that Plaintiff had not overcome the presumption of continuing
26 nondisability. <u>Id.</u> at 24. Accordingly, the ALJ concluded that the Plaintiff "was not disabled
27 under sections 216(i) and 223(d), respectively, of the Social Security Act through December
28 31, 2007, the date last insured." <u>Id.</u> at 24. Therefore, the ALJ determined that Plaintiff was

- 8 -

1 not entitled to disability insurance benefits under Title II. Id.

2 The ALJ further determined, however, that although Plaintiff had not overcome the presumption of continuing nondisability, because he was going to enter a new age category on December 4, 2009, he would qualify as disabled under 20 C.F.R. § 404.1520(g) on that date and would become eligible for supplemental security income under Title XVI.[2] Id. at 16. Applying the rules "non-mechanically," the ALJ found "changed circumstances" as of June 4, 2009. Id. Therefore, the ALJ concluded that, "the claimant has been disabled under section 1614(a)(3)(A) of the Social Security Act beginning on June 4, 2009." Id.

## II.    STANDARD OF REVIEW

To qualify for disability insurance benefits, an applicant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c (a)(3)(A). The applicant must also show that he has a physical or mental impairment of such severity that the applicant is not only unable to do his previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). To determine whether an applicant is eligible for disability insurance benefits, the ALJ must conduct the following five-step sequential analysis:

> (1) determine whether the applicant is currently employed in substantial gainful activity;

---

[2] The federal regulations state that "when [the Social Security Administration] decide[s] whether [a claimant] is disabled under § 404.1520(g), [it] will consider [the claimant's] age in combination with [his or her] residual functional capacity, education and work experience." 20 C.F.R. § 404.1563(a). The regulation defines three distinct age categories: (1) younger person; (2) person closely approaching advanced age; and (3) person of advanced age. § 404.1563(c)–(e). The regulation further states, "[w]e consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work." § 404.1563(e). Accordingly, there are "special rules for persons of advanced age." Id.

>(2) determine whether the applicant has a medically severe impairment or combination of impairments;
>
>(3) determine whether any of the applicant's impairments equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;
>
>(4) if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;
>
>(5) if not, determine whether the applicant is able to perform other work that exists in substantial numbers in the national economy.

20 CFR §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987).

The Court must affirm an ALJ's findings of fact if they are supported by substantial evidence and free from reversible legal error. See 42 U.S.C. 405(g); see also Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005). Substantial evidence means "more than a mere scintilla," but less than a preponderance, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See, e.g., Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

In determining whether substantial evidence supports a decision, the record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); see also Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). Nonetheless, "[i]t is for the ALJ, not the courts, to resolve ambiguities and conflicts in the medical testimony and evidence." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations and internal quotation marks omitted). The ALJ may draw inferences logically flowing from the evidence, and "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion which must be upheld." Id. (citation omitted). Regardless, "[i]f the evidence can support either affirming or reversing the ALJ's conclusion, [then the Court] may not substitute [its] judgment for that of the ALJ." Robbins v. Social Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

**III.   DISCUSSION**

Plaintiff contends that ALJ Gavin erred by: (1) rejecting treating physician opinion; (2) misinterpreting the evidence to the detriment of the Plaintiff; and (3) misapplying Chavez v. Bowen. (Doc. 20). The Defendant disagrees on all grounds, and argues that the ALJ's decision was supported by substantial evidence and should be affirmed. (Doc. 24). To the extent that the ALJ's application of Chavez is premised on her conclusion that Dr. Subhan was unreliable, the Court will address the issues concerning Dr. Mohammed Subhan first.

### A. ALJ GAVIN'S REJECTION OF TREATING PHYSICIAN OPINIONS

The Ninth Circuit has held that if an ALJ "wishes to disregard the opinion of the treating physician he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983). Substantial evidence means "more than a mere scintilla," but less than a preponderance, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Sandgathe, 108 F.3d at 980. In determining whether there is substantial evidence in the record to support the ALJ's decision, the Court must look at the record in its entirety. Richardson, 402 U.S. 401. Nonetheless, where there are ambiguities in the record, and the evidence is subject to multiple interpretations, the Court may not substitute its judgment for that of the ALJ. Robbins, 466 F.3d 882.

ALJ Gavin determined that "Dr. Subhan's recommendations are accorded no weight due to their inconsistency with his own observations of Mr. Bose's functioning." (Doc. 19-3 at 21). The medical evidence of record indicates that although Dr. Subhan's medical group treated the Plaintiff for some time, Dr. Subhan himself examined the Plaintiff on only seven occasions. At each of these exams, Dr. Subhan prepared thorough reports that described symptoms that the patient exhibited. (Doc. 19-9 at 73–79, 83–92). Although Dr. Subhan consistently stated that the Plaintiff suffered from degenerative disc disease, chronic back pain, and chronic neck pain, at all seven of the examinations, he noted that Plaintiff's neck "demonstrated no decrease in suppleness." Id. In addition, at six of the seven exams, Dr. Subhan noted that Plaintiff's back was "normal" and indicated no symptoms. Id. On only one occasion did Dr. Subhan note that Plaintiff's back experienced "tenderness on

- 11 -

1  palpitation" and "muscle spasm." Id. at 88. In fact, Plaintiff concedes that Dr. Subhan's
2  "later records are void of discussion of back pain." (Doc. 20 at 7). After these examinations,
3  Dr. Subhan prepared two separate reports assessing Plaintiff's ability to do work. (Doc. 19-9
4  at 93–95). The most recent of these reports was prepared on June 7, 2009, and essentially
5  indicated that Plaintiff's pain conditions completely precluded him from working. Id.

6       After independently reviewing the record as a whole, and applying the legal standards
7  set forth *supra*, the Court finds that the ALJ's decision to discredit Dr. Subhan's reports is
8  supported by substantial evidence. Dr. Subhan's medical examination reports do not appear
9  to comport with his eventual assessments of Plaintiff's ability to do work related activities.
10 During the exams, Dr. Subhan certainly noted that Plaintiff suffered from some levels of
11 pain, but Dr. Subhan never reported any symptoms at all that would substantiate the severe
12 limitations that they allegedly put on Plaintiff's ability to work. Rather, Dr. Subhan's reports
13 indicate that six of the seven times that he saw the Plaintiff, he was not suffering from any
14 immediate symptoms. Thus, to the extent that the ALJ was presented with irreconcilable
15 opinions from Dr. Subhan, her decision to not credit Dr. Subhan's eventual conclusion about
16 Plaintiff's ability to work was supported by substantial evidence. See Robbins, 466 F.3d
17 882. This is particularly true in light of the medical evidence from Dr. Kane indicating that
18 Plaintiff's back pain had actually been improving significantly in late 2007, the same time
19 that Dr. Subhan performed his initial exams of the Plaintiff.

20      Plaintiff also argues that the ALJ erred by not considering the letter written by Dr.
21 Salim. (Doc. 20 at 7). Specifically, Plaintiff alleges that the ALJ erred because the "opinion
22 of Dr. Subhan is corroborated" by Dr. Salim's letter. Id. The fact that the ALJ failed to
23 address the letter, however, is not outcome determinative. Instead, the "relevant inquiry in
24 this context is not whether the ALJ would have made a different decision absent any error
25 . . . it is whether the ALJ's decision remains legally valid, despite such error." Carmickle v.
26 Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008). Thus, so long as "there
27 remains substantial evidence supporting the ALJ's conclusions . . . on credibility and the
28 error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed

1 harmless and does not warrant reversal." Id. (internal quotations and citations omitted).

2     Dr. Salim's letter is dated December 20, 2007 and states that Dr. Salim has been
3 treating Plaintiff for an undisclosed period of time. (Doc. 19-9 at 31). The letter further
4 asserts that Plaintiff suffers from pain on a daily basis and the pain limits Plaintiff's ability
5 to function. Id. Although the record indicates that Dr. Salim did treat Plaintiff from April
6 26 to May 24, 2005 (a period already considered by the initial ALJ), no evidence was
7 provided of treatment during the relevant time period. Thus, to the extent that Dr. Salim's
8 letter is based on medical findings outside of the relevant time period, and to the extent that
9 Dr. Salim fails to provide any relevant medical evidence to support her conclusions, the
10 Court is not persuaded that the letter undermines the many reasons that the ALJ had for
11 rejecting Dr. Subhan's opinions. See Carmickle, 533 F.3d at 1162. Therefore, for the
12 reasons already discussed, the Court finds that although the ALJ erred by not considering Dr.
13 Salim's letter, the ALJ's ultimate conclusion regarding Dr. Subhan's assessment is supported
14 by substantial evidence. Accordingly, the ALJ's decision to reject Dr. Subhan's opinions
15 was legally sound and the Court will not disturb it.[3]

16         **B.    ALJ GAVIN'S INTERPRETATION OF MEDICAL EVIDENCE**

17     Plaintiff contends that the ALJ misinterpreted medical evidence, specifically Dr.
18 Subhan's reports. (Doc. 20). The ultimate conclusions of treating physicians "must be given
19 substantial weight; they cannot be disregarded unless clear and convincing reasons for doing
20 so exist and are set forth in proper detail." Embry v. Bowen, 849 F.2d 418, 422 (9th Cir.
21 1988). For the reasons set forth above, the Court is satisfied that the ALJ has presented
22 sufficient evidence to justify the decision to interpret the medical evidence contrary to Dr.

---

24     [3]Plaintiff also notes that The ALJ may have misunderstood the alleged onset date.
25 (Doc. 20 at 9). Plaintiff asserts that a misunderstanding of the onset date "could cloud the ALJ decision" by allowing the ALJ to consider information outside of the relevant time
26 frame. Id. There is no evidence in the record, however, that indicates that The ALJ attempted to reevaluate or reopen any medical evidence that was discussed in the prior ALJ
27 decision. Accordingly, the fact that The ALJ never explicitly indicated that she would be
28 using the amended onset date is inconsequential.

- 13 -

1    Subhan's interpretations. Accordingly, the Court will not disturb the ALJ's interpretations.

2    **C.   APPLICATION OF <u>CHAVEZ V. BOWEN</u>**

3    In <u>Chavez v. Bowen</u>, the Ninth Circuit stated that "the principles of res judicata apply
4    to administrative decisions, although the doctrine is applied less rigidly to administrative
5    proceedings than to judicial proceedings." 844. F.2d at 693. Additionally, the Ninth Circuit
6    has held that, "in order to overcome the presumption of continuing nondisability arising from
7    the first administrative law judge's findings of nondisability, [a claimant] must prove
8    'changed circumstances' indicating greater disability." <u>Id.</u> (citing <u>Taylor v. Heckler</u>, 765
9    F.2d 872, 875 (9th Cir. 1985)). An ALJ may not, however, "apply res judicata where the
10   claimant raises a new issue, such as the existence of an impairment not considered in the
11   previous application." <u>Lester v. Chater</u>, 81 F.3d 821, 827 (9th Cir. 1995) (citing <u>Gregory v.
12   Bowen</u>, 844 F.2d 664 (9th Cir. 1988)).

13   Plaintiff alleges that the ALJ incorrectly applied the standards set out in <u>Chavez</u>.
14   (Doc. 20). Specifically, Plaintiff takes issue with the ALJ's conclusion that "[t]he new
15   medical evidence of record does not establish greater impairment than prior to August 23,
16   2006, and so the threshold for changed circumstances pursuant to <u>Chavez</u> is not met upon a
17   basis of worsening impairment." (Doc. 19-3 at 19). Plaintiff asserts that <u>Chavez</u> requires a
18   showing of both changed circumstances and worsening impairment, and that those showings
19   are "mutually exclusive." (Doc. 20). By reading <u>Chavez</u>'s holding in the disjunctive,
20   however, Plaintiff misunderstands it. <u>Chavez</u> explicitly states that a claimant must prove
21   "changed circumstances *indicating* greater disability." 844 F.2d at 693 (internal quotations
22   omitted) (emphasis added). Based on the word "indicating," it is clear that there must be a
23   causal relationship between the changed circumstances and the greater disability.
24   Accordingly, while the Plaintiff is correct that he must demonstrate both changed
25   circumstances and greater disability, <u>Chavez</u> dictates that he must do so in a manner that

26

27

28

shows a causal relationship between the two.[4]

Plaintiff asserts three grounds for changed circumstances: (1) recurrent headaches; (2) recurrent cervical spine pain; and (3) the "residual functional capacity" assessment completed by Dr. Subhan. (Doc. 20). These three grounds will be addressed and discussed below.

Plaintiff first alleges that "the recurrent headaches and pain show a worsening condition than that assessed by the prior ALJ." (Doc. 20 at 6). Plaintiff fails, however, to point to any portion of the record indicating that he now suffers from headaches that are more severe or more frequent than those that the ALJ discussed in the initial decision. Therefore, to the extent that Plaintiff makes only conclusory assertions of worsening headaches without reference to any medical evidence of record, the Court is satisfied that the ALJ's determination that Plaintiff failed to demonstrate changed circumstances on that point was substantially justified.

Next, Plaintiff asserts that he has demonstrated changed circumstances by the continuing need for epidural injections to control his cervical pain. Once again, Plaintiff fails to point to any medical evidence of record suggesting that his lumbar pain has *worsened*. Instead, it appears that Plaintiff is asserting that his need to continue with a beneficial course of treatment somehow reflects a greater impairment. The Ninth Circuit has emphasized that "impairments that can be controlled effectively with medication are not disabling for the purpose of determining SSI benefits." Warre v. Comm'r of Soc. Sec., 438 F.3d 1001, 1006 (9th Cir. 2006). That holding is particularly applicable here, where Dr. Kane's reports indicate that lumbar injections significantly reduced Plaintiff's back pain. Accordingly, Plaintiff's argument that a continuing ailment, successfully managed by medication, qualifies as a "changed circumstance," fails as a matter of law.

Furthermore, Plaintiff is unable to demonstrate changed circumstances based on Dr. Salim's letter. As discussed previously, Dr. Salim's letter appears to be based on medical

---

[4] To the extent that Plaintiff appears to misunderstand Chavez, the Court will construe all of Plaintiff's arguments regarding any changes in medical conditions as ones pertaining to the "changed circumstances" element of Chavez.

- 15 -

1 evidence obtained during a period that was already adjudicated by ALJ Dickinson. And, to
2 the extent that ALJ Dickinson's findings must be given a degree of res judicata effect,
3 Plaintiff cannot attempt to resurrect medical facts that have already been decided simply by
4 having his doctor refer to those facts at a later time. See Chavez, 844 F.2d at 693. Therefore,
5 the ALJ's determination that Plaintiff failed to demonstrate a "changed circumstance" based
6 on his continued therapy was substantially justified.

7 Finally, Plaintiff asserts that the "residual functional capacity" exams performed by
8 Dr. Subhan demonstrate a "changed circumstance" indicating greater disability. (Doc. 20).
9 As discussed in Section A, *supra*, the Court is satisfied that the ALJ's decision not to credit
10 Dr. Subhan's reports regarding Plaintiff's ability to work was supported by substantial
11 evidence. In sum, Plaintiff has failed to demonstrate any "changed circumstance" that would
12 indicate greater disability. Accordingly, the ALJ's application of Chavez was not erroneous,
13 and the Court will not displace it.

14 **IV.   CONCLUSION**

15 For the reasons set forth above, the Court finds that the ALJ's decision to deny
16 Plaintiff benefits was supported by substantial evidence.

17 **Accordingly,**

18 **IT IS HEREBY ORDERED** affirming the Commissioner of Social Security's
19 decision to deny Plaintiff's disability benefits.

20 DATED this 31st day of March, 2011.

_____
Mary H. Murguia
United States District Judge